**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF: J.K.R.R. AND J.P.J., MINORS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.M.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1637 MDA 2021 |

Appeal from the Decree Entered December 6, 2021
In the Court of Common Pleas of Lebanon County
Orphans' Court at No(s):  2020-00508

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:          **FILED: JUNE 10, 2022**

L.M.R. ("Mother") appeals from the decree granting the petition filed by Lebanon County Children and Youth Services (the "Agency") and terminating her parental rights to her sons, J.K.R.R. (born in October 2017) and J.P.J. (born in August 2018) (collectively, "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2) and (b).[1]  After careful review, we affirm.

The Agency received a referral in August 2018, shortly after J.P.J.'s preterm birth, because J.P.J. had been transported to Hershey Medical Center, and Mother could not authorize treatment for him because she did not have proper identification. *See* N.T., 8/23/21, at 6-7. This event prompted the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The decree also terminated the parental rights of Children's natural father, G.J. ("Father"). Father is not a party to the instant appeal.

Agency to file emergency adjudication petitions, and both Children were adjudicated dependent in September 2018. *See id.* at 10. At some time during J.P.J.'s nearly two-month hospitalization, Mother was evicted from the domestic violence shelter where she had been staying. *See id.* at 11. Children were placed in foster care upon J.P.J.'s discharge from the hospital. *See id.* at 10-11.

During the first two permanency review hearings, the Agency concluded Mother had made moderate progress on her goals. By the third permanency review hearing, Mother was making minimal progress. The Agency filed a petition to involuntarily terminate Mother's parental rights to Children on August 14, 2020. The orphans' court appointed legal counsel and a guardian *ad litem* ("GAL") for Children.

Children were returned to Mother in November 2020. *See id.* at 5, 13. Mother continued to have an ongoing issue with marijuana use. *See id.* at 13. On January 8, 2021, Mother was arrested pursuant to a bench warrant issued because she had missed a court date. *See id.* at 14. Children were living in a hotel room with Mother at that time; they were again put in foster care placement. *See id.* After a permanency review hearing on January 28, 2021, the orphans' court concluded the Agency had made reasonable efforts to finalize a permanency plan; Children had regressed; and Mother had made only minimal progress. *See* Exhibits 5 and 6 (Permanency Review Orders for J.K.R.R. and J.P.J., respectively); *see also* N.T., 8/23/21, at 16 (wherein the

family's caseworker explained that Children had regressed "in their potty[-]trained behavior, in their attitudes, and hitting and in cursing"). Children were returned to foster care, and the orphans' court changed the permanency goal to adoption. *See* Exhibits 5 and 6.

In May 2021, Mother was pregnant with her third child, continued to use marijuana, and had moved into a domestic violence shelter in Lebanon, Pennsylvania. *See* N.T., 8/23/21, at 17. Mother later moved to a shelter in Ohio, where she could receive support and programming specific to domestic violence and parenting. *See id.* at 17-18. However, Mother left the program in early August and was not allowed to return. *See id.* at 19-21.

The Agency proceeded with termination, and the orphans' court conducted hearings on August 23, 2021, and December 2, 2021. At the time of the first hearing, J.P.J. had been in placement for about 34 months, and J.K.R.R. had been in placement for about 32 months. *See id.* at 25. Children had only been in Mother's care for approximately two months out of the preceding three years. *See id.* After the hearings, the orphans' court granted the Agency's petition and terminated Mother's parental rights to Children. Mother filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother asserts the orphans' court improperly terminated her parental rights to Children without clear and convincing evidence to support

its determination. **See** Mother's Brief at 11-14. Mother's brief provides only minimal argument and fails to address the requirements of Section 2511(a)(1), (8), and (b) with any specificity.[2] Mother generally argues the orphans' court failed to consider progress she had made to achieve the goals set by the Agency. **See id.** Mother claims she attended Children's medical and dental appointments, maintained contact with foster mother, and visited Children. **See id.** at 13-14. She also contends Children are bonded with her, and termination would have a detrimental effect on Children. **See id.** at 14.

We apply a deferential standard of review in appeals from orders terminating parental rights:

> The standard of review in termination of parental rights requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In the Interest of: J.R.R.**, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

---

[2] We could deem Mother's claim waived on this basis. **See In re M.Z.T.M.W.**, 163 A.3d 462, 465-66 (Pa. Super. 2017).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***See In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). The clear and convincing evidence standard "is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation and internal quotation marks omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1), (8), and (b). This Court may affirm the orphans' court's decision to terminate parental rights if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re Adoption of C.D.R.***, 111 A.3d 1212, 1215 (Pa. Super. 2015). We will focus our analysis on Section 2511(a)(1) and (b), which provide as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \* \* \*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1) and (b).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). The court will look most critically to the six months immediately preceding the filing of the petition but must also consider the entire history of the case. *See In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009). In considering the totality of the circumstances, we remain cognizant that the term "parental duties" includes an inexhaustible number of requirements, including both physical and emotional needs, as well as guidance and support. *See In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (internal citations omitted).

Contrary to Mother's assertions, the orphans' court's decision to terminate her parental rights is supported by clear and convincing evidence. CYS caseworker Guinevere Garlow testified the Agency became formally involved at the time of J.P.J.'s birth in August 2018. *See* N.T., 8/23/21, at 6; *see also id.* (wherein Garlow explained the Agency had previously received referrals for the family based on domestic violence, homelessness and mental health issues). J.P.J. was born preterm; he and Mother were both taken to Good Samaritan Hospital, and J.P.J. was ultimately transferred to Hershey Medical Center. *See id.* at 7. Mother did not have proper identification to prove she was J.P.J.'s mother and was unable to "sign for him" or make medical decisions on his behalf. *See id.* The Agency subsequently filed dependency petitions for both Children. *See id.* at 7-8.[3] Children were placed in foster care when J.P.J. was discharged from the hospital. *See id.* at 10.

The record reflects that the initial August 2018 permanency plans for Children noted concerns of unstable housing and income, parents' mental health and a lack of appropriate caregiver. *See* Petition for Involuntary Termination of Parental Rights, 8/14/20, Exhibits P (Initial Permanency Plan -

---

[3] The dependency petition for J.K.R.R. alleged the Agency was alerted to concerns that he was missing medical appointments between April 2018 and July 2018, but the Agency was unable to locate the family. *See* Exhibit 3 (Dependency Petition - J.K.R.R.). The Agency finally regained contact with Mother when Hershey Medical Center contacted the Agency about J.P.J. *See id.*

J.P.J.) and Q (Initial Permanency Plan - J.K.R.R.). The agency identified 20 permanency goals for Mother: (1) cooperate with the Agency as requested; (2) inform the Agency of any address or phone number changes; (3) follow recommendations of Agency and other service providers; (4) complete a drug and alcohol evaluation; (5) follow all recommendations from the drug and alcohol evaluation; (6) abstain from using illegal drugs; (7) cooperate in random drug screens; (8) refrain from criminal activity; (9) cooperate with home visits; (10) obtain and maintain stable income for six months; (11) obtain and maintain stable housing for six months; (12) pay child support as ordered; (13) complete a mental health evaluation; (14) follow mental health recommendations; (15) complete an infant parenting class; (16) demonstrate an ability to apply knowledge from parenting classes; (17) attend medical appointments for Children; (18) complete an anger management course; (19) visit Children weekly; (20) sign necessary releases as requested by the caseworker. ***See id.***

The orphans' court conducted review hearings approximately every six months. Garlow testified that Mother's compliance with her permanency plan goals was described as moderate at the March 2019 and December 2019 review hearings. ***See*** N.T., 8/23/21, at 11. By the time of the next hearing in February 2020, Mother's compliance was minimal. ***See id.*** at 12. In June 2020, Children's placement was changed due to behavioral problems reported

by the foster mother. *See id.* The Agency filed the termination petition on August 14, 2020. *See id.*

Garlow testified that by the September 2020 review hearing, Mother had again made minimal progress, but the Agency decided to delay acting on the termination petition in hopes of reuniting Children with Mother. *See id.* at 12-13. Children were returned to Mother's care in November 2020. *See id.* at 13. In early January 2021, Mother tested positive for marijuana, which Garlow described as an ongoing issue. *See id.* at 13-14. Shortly thereafter, Mother was arrested pursuant to a bench warrant. *See id.* at 14. At that time, Mother and Children were living in a hotel room, and upon Mother's arrest, Children were returned to foster care. *See id.*

After the January 2021 review hearing, Children's permanency goals were changed from reunification to adoption and physical and legal custody was transferred to the Agency. *See id.* at 15-16; *see also* Exhibits 5 (Permanency Review Order - J.K.R.R.) and 6 (Permanency Review Order - J.P.J.). In the review orders, the orphans' court noted Mother's minimal compliance with the permanency plan and indicated the existing placement was no longer feasible because Mother was unable to care for Children and they had regressed. *See* Exhibits 5 and 6. Garlow explained that Children's previous behavioral problems had been addressed prior to their return to Mother, but after they were returned to foster care, Children displayed

regression "in their potty[-]trained behavior, in their attitudes, and hitting and in cursing." N.T., 8/23/21, at 16.

Garlow testified that Mother entered a shelter in May 2021; at that time, Mother was still using marijuana and was pregnant with her third child. **See id.** at 17. In June, following an incident of domestic violence, Mother moved to another shelter in Ohio, which had programming to help with her pregnancy and parenting. **See id.** at 17-19.

Next, Garlow reviewed Mother's progress as of the June 2021 review hearing. According to Garlow, Mother was more cooperative with the Agency since she had moved to the Ohio shelter. **See id.** at 35. Garlow acknowledged that Mother had made progress toward some of her goals, including completion of a drug and alcohol program, seeking mental health treatment, and completing anger management and parenting classes. **See id.** at 36-37.

However, Garlow testified that Mother was unable to maintain stable housing for any six-month period throughout the entire proceedings; Mother also tested positive for marijuana multiple times. **See id.** at 36. Mother had been employed at some point, but no longer had a job. **See id.** at 38. Garlow testified that, despite the progress Mother had made toward some goals, Mother continued to engage in concerning behaviors "such as drinking alcohol as well as being in a relationship that could put herself or her unborn baby and her [Children] in the future at risk." **Id.** at 38; **id.** at 22 (stating that Mother tested positive for alcohol in the week prior to the first termination

hearing; Mother denied her results and refused to take another drug test on the date of the hearing); *see also* Exhibits 9 (June 2021 Permanency Plan - J.K.R.R.) and 10 (June 2021 Permanency Plan - J.P.J.).[4]

Further, at the time of the first termination hearing, J.P.J. had been in placement for 34 months, all but approximately two months of his life. **See** N.T., 8/23/21, at 25. J.K.R.R. had been in placement for 32 months and had resided with Mother for only about two months. **See id.**

Upon review, we conclude that the record supports the orphans' court's determination that Mother failed to perform her parental duties. Despite Mother's claims, the orphans' court did not ignore progress Mother had made toward some of her permanency plan goals. **See** Orphans' Court Opinion, 1/12/22, at 20 (recognizing Mother exhibited love for Children and provided minor material items for them). Rather, the orphans' court determined that Mother had been unable to attain her most significant goals, *i.e.*, obtaining stable housing and employment and refraining from illegal drug use, despite

---

[4] Garlow provided an update on Mother's progress during the second termination hearing on December 2, 2021. Mother gave birth to a third child in November 2021, and she tested positive for marijuana at the time of birth. **See** N.T., 12/2/21, at 9-10, 13. Garlow testified that Mother's drug use remains a concern in this case. **See id.** at 11. Mother had told the Agency about new employment at Arby's but was unable to provide pay stubs or other proof of employment. **See id.** at 13. At the time of the hearing, Mother was in jail for missing a court date for unrelated criminal charges she received after Children were removed from her care. **See id.** at 13-14. Garlow testified that the Agency's primary concerns of unstable housing and employment remained an issue. **See id.** at 19.

the opportunities, time, and resources the Agency had provided to Mother.

Mother also remained in contact with Father, with whom she had experienced

incidents of domestic violence. The Agency provided Mother the opportunity

to resume Children's care, but Mother was arrested within two months after

Children's return to her care. Children have therefore been in Mother's care

for only two months out of the three-year duration of this case. We discern no

abuse of discretion or error of law in the orphans' court's determination that

termination was justified under Section 2511(a)(1).

In addressing Section 2511(b), we turn our focus to the best interests

of Children, including their developmental, physical and emotional needs, and

welfare.[5] *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

In considering the best interests of a child,

> [t]he court must carefully consider the tangible dimension, as well
> as the intangible dimension, of the needs and welfare of a child,
> such as the love, comfort, security, and closeness, all of which are
> part of a parent-child relationship. Continuity of relationships is
> also important to a child. In considering what situation would best
> serve the child's needs and welfare, the court must examine the
> status of the bond between the natural parent and the child to
> consider whether terminating the natural parents' rights would
> destroy an existing, necessary and beneficial relationship.

*In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003) (internal

citations omitted). While a child's bond with a parent is relevant, "concluding

---

[5] Though Mother does not explicitly allege that termination of her parental
rights is not in Children's best interests, it is an issue plausibly suggested by
a fair reading of her argument. We therefore consider Section 2511(b) as part
of our analysis.

- 12 -

a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound." *In re K.K.R.S.*, 958 A.2d 529, 535 (Pa. Super. 2008). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

The court may also emphasize the health and safety of a child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). "A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121 (citation omitted). This Court has repeatedly stated that "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006) (citation and brackets omitted).

Here, Garlow testified that Children are "very bonded" to Mother; Children are excited for their visits with Mother and cry when the visits conclude. *See* N.T., 8/23/21, at 43, 45-46. However, the foster parents relayed to Garlow that Children rarely talk about Mother outside of their visits. *See id.* at 46. Garlow opined that Children would feel hurt by severance of their bond with Mother, but that ultimately, termination would be in Children's best interests because it would allow them to have permanency and

consistency. *See id.* Garlow testified Children's current foster home provides consistency and is a pre-adoptive resource. *See id.* at 47. Since their placement in the foster home in July 2021, Children have not exhibited aggression or other behavioral problems. *See id.*

The record reflects that the orphans' court appropriately considered the effect of termination of Mother's rights on Children pursuant to Section 2511(b). Children have been in placement for approximately three years, with J.P.J. in placement for essentially his entire life. As Garlow acknowledged, Children are bonded with Mother; however, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted). Children have exhibited progress in their current foster home, and the foster family is a pre-adoptive resource that will provide Children with stability and permanency. Therefore, the orphans' court did not abuse its discretion or commit an error of law in determining that termination of Mother's parental rights is in Children's best interests.

As we conclude that the orphans' court did not err in terminating Mother's parental rights, we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/10/2022